UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 23-cr-39 (TSC) |
| v. | : | |
| | : | |
| VICTOR MARTINEZ | : | |
| | : | |
| Defendant | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Victor Martinez to 14 days' incarceration, a 36-month term of probation, 60 hours of community service, and $500 in restitution in this case.

I.   **Introduction**

The defendant, Victor Martinez ("Martinez"), a 41-year-old, unemployed man who traveled all the way from San Antonio Texas to participate in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

Martinez pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a short term of incarceration is appropriate in this case because he was among a group of rioters that massed outside the east front Rotunda doors and facilitated a secondary breach from 2:37 pm to 2:42 pm.

The Court must also consider that Martinez's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to delay the certification vote. Martinez was inside the Capitol for over 50 minutes, including inside the Rotunda where physical skirmishes took place between police and rioters. Martinez self-surrendered as directed by the FBI, and without any type of immunity or other consideration, he agreed to be interviewed and incriminated himself. He did not then, and has not since, genuinely expressed sincere remorse for his criminal conduct on January 6. Martinez largely downplayed the scale and scope of violence and property destruction but was otherwise candid about his participation and respectful in his interactions with police. Consequently, the facts and circumstances of Martinez's conduct support a sentence of 14 days' incarceration as a part of a 36-month term of probation, 60 hours of community service, and $500 restitution in this case.

## II. Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 18 (Statement of Offense), at ¶¶ 1-7.

*Defendant Martinez's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Martinez traveled to Washington, D.C., from his home in San Antonio, Texas to attend the "Stop the Steal" rally.

After attending the former President's rally at the Ellipse, Martinez and Jamie Lynn Ferguson,[2] joined the crowd advancing on the U.S. Capitol. They approached the U.S. Capitol from the east front and massed with other rioters outside the Rotunda doors. At approximately 2:37 pm, the rioters outside the Capitol, assisted by rioters inside, overpowered a small number of U.S. Capitol Police officers defending the doors and successfully reestablished the breach of the east front Rotunda doors.



*Image 1: Screenshot from open-source video; Martinez entering east front Rotunda doors*

---

[2] Like Martinez, Jamie Lynn Ferguson pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. *United States v. Ferguson*, 22-CR-194 (APM). Ferguson followed Martinez through the east front Rotunda doors, exploiting the secondary breach at this location, and entered the U.S. Capitol at approximately 2:42 pm. She remained inside the Capitol Building with Martinez for approximately 50 minutes. Unlike Martinez, she made statements on social media before January 6 revealing that she at least anticipated some level of violence on that day. On December 23, 2022, Judge Mehta sentenced Ferguson to a two-year term of probation. ECF No. 23.

Martinez and Ferguson exploited this secondary breach, as officers struggled in vain to contain it, and pushed into the Capitol at approximately 2:42 pm. Martinez led his small group, bumping against a Capitol police officer as he rushed through the breach point. *See* Images 2, 3, and Exhibit 1.


*Image 2: Still from USCP CCTV; Martinez entering Rotunda interior*


*Image 3: Still from USCP CCTV; Martinez bumping against a Capitol police officer as he enters*

Martinez and Ferguson proceeded directly to the Rotunda, where Martinez participated in celebration, singing, and prayer with fellow rioters.[3]  *See* Exhibit 2.

  

*Images 4-6: Screenshots from open source video showing Martinez inside the Rotunda*

While inside the Capitol, Martinez walked around the Rotunda from approximately 2:42 pm until 3:18 pm. Martinez was present as police officers massed and encountered violent resistance as they attempted to clear the Rotunda. *See* Exhibit 3. At one point, Martinez, moved forward toward the line of police engaged in violent skirmishes with rioters, holding his phone above his head as if recording and celebrating the violence. Id. Rather than immediately leaving the Rotunda when he saw the violence, Martinez and his group remained there for several minutes, further contributing to the disorder, and further preventing police from clearing the area. Id.; *see also* Image 7.

---

[3] In one open-source recording (Exhibit 2), Martinez can be heard joining others in a rendition of "*Glory, Glory Hallelujah.*"



*Image 7: Still from USCP CCTV; Martinez inside Rotunda moving toward the police line*

Martinez and Ferguson only moved back into the Rotunda Interior as the police line surged forward in an effort to clear the Rotunda, and he exited the Capitol via the east front Rotunda doors at approximately 3:33 pm.



*Image 8: Still from USCP CCTV; Martinez inside Rotunda interior*

6

In total, Martinez and Ferguson spent more than 50 minutes inside of the Capitol. Though in his initial statement to the FBI, Martinez denied knowing that he was not authorized to enter the building, he has since admitted that he knew at the time they entered the U.S. Capitol Building that he did not have permission to do so, and that he did so with the purpose of Parading, Demonstrating, or Picketing in a Capitol Building.

*Martinez's Post-arrest Interview with the FBI*

On January 24, 2023, Martinez gave a voluntary post-arrest interview to the FBI. During the interview, he admitted traveling to Washington, D.C. so he could say he was a "part of history," but acknowledged that it "totally backfired."

Martinez readily identified himself in each of the photographs presented by the agents, depicting him on or near the Capitol grounds and inside the U.S. Capitol on January 6, 2023. He told agents that he was there for a girl, "Jamie Lynn," that they were present for the former President's speech at the Ellipse, and then followed his instructions to "peacefully march to the Capitol and let [their] voices be heard."

To a large extent, Martinez minimized his unlawful conduct during his interview with the FBI, stating "it seemed like everyone was having a good time," and "it didn't seem violent to me." He denied knowing that he was entering a restricted area, seeing signs, or knowing that the certification proceedings were still underway, thinking they had already concluded by the time the mob breached the U.S. Capitol. He claimed that he observed Capitol Police officers standing to the side, not blocking the doors, not saying anything, but just nodding, which is contradicted by the fact that he bumped against an officer as he entered and witnessed violent skirmishes between

rioters and police while inside the Rotunda.[4] Martinez also appeared to shift blame, stating that he assumed "agitators" were there "trying to make us look bad, and obviously did."

Nonetheless, Martinez acknowledged seeing some people breaking windows, and that his desire to be "part of history" had "backfired."

*The Charges and Plea Agreement*

On January 20, 2023, the United States charged Martinez by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 24, 2023, Martinez self-surrendered, as directed by law enforcement agents. On February 2, 2023, the United States charged Martinez by a 4-count Information with violating the same four statutes. On April 7, 2023, pursuant to a plea agreement, Martinez pleaded guilty to Count 4 of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Martinez agreed to pay $500 in restitution to the Architect of the Capitol.

### III. Statutory Penalties

Martinez now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Martinez faces up to six months of imprisonment and a fine of up to $5,000. Martinez must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the

---

[4] *See* Images 3 and 7; *see also* Exhibits 1 and 3.

Section 3553(a) factors weigh in favor of 14 days' incarceration as a condition of a 36-month term of probation, 60 hours of community service, and $500 restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Martinez's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Martinez, the absence of violent or destructive acts is not a mitigating factor. Had Martinez engaged in such conduct, he would have faced additional criminal charges.

Some of the most important factors in Martinez's case is that he was among a group of rioters that facilitated a secondary breach of the east front Rotunda doors from 2:37 pm to 2:42 pm, that this breach involved violence, that he remained inside the Capitol for an extended 50 minutes, and he has yet to truly demonstrate remorse for his conduct.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 14 days' incarceration in this matter.

### B.  The History and Characteristics of Martinez

As set forth in the PSR, Martinez's criminal history consists of a misdemeanor conviction for Operating a Vehicle while Intoxicated in 2001. ECF 20 ¶ 27. Martinez is a 41-year-old male with prior military service, some college, and receiving disability benefits since 2013. ECF 20 ¶¶ 56-59. Martinez served in the United States Marine Corps on active duty from 2006 until he

9

was honorably discharged in 2010. ECF 20 ¶¶ 56, 59.  He was trained as a Basic Engineer Equipment Mechanic and had one overseas deployment to Iraq in 2008. Id. Martinez has been compliant with his conditions of pre-trial release.

While Martinez's military service is laudable, it renders his conduct on January 6 all the more concerning.  His voluntary decision to storm a guarded government building, in light of his former military service and training, is disappointing. In this case, Martinez's conduct and former military service demonstrates a very real need for specific deterrence in the form of some period of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Martinez's conduct in comparison to others was on the low end of the spectrum. Nonetheless, as with other defendants who made the conscious decision to unlawfully enter the Capitol during a riot, and who knowingly and willfully spent approximately 50 minutes inside the building during that riot, and who have not sincerely expressed remorse for their conduct, specific deterrence is warranted in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

11

Court must sentence Martinez based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in

the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out,

13

you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Dona Sue Bissey pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). Bissey likely entered the U.S. Capitol via the Senate Wing doors at or around 2:50 pm and remained inside the Capitol for approximately 10 minutes.[6] Bissey remained inside the Capitol for a short period of time, in contrast to the 50 minutes Martinez spent inside. While Martinez had no discernable social media presence, Bissey was active on social media; her posts regarding the events of January 6 were exuberant and celebratory. Consequently, this Court doubted her later expressions of remorse, and sentenced Bissey to 14 days' incarceration. 22-cr-165 (TSC).

Nicholas Lattanzi pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). Lattanzi, like Bissey, and in contrast to Martinez, was active on social media, announcing his planned trip to D.C. on TikTok and posting selfies with fellow rioters at the "Stop the Steal" rally. Lattanzi entered the U.S. Capitol via the Senate Wing doors at approximately 3:22 pm, carrying a white flag. Lattanzi remained inside the Capitol for only 5 minutes, far less than Martinez. Lattanzi also lied in his initial post-arrest interview, denying that he entered the Capitol, but through his attorney requested a second interview in which he amended his previous statement, acknowledging his entry and describing the circumstances. While Martinez was initially more truthful about his entry and participation, he largely downplayed the scale and scope of the violence and destruction

---

[6] The time and location of Bissey's entry were unclear from the complaint and attached affidavit. *See* 21-cr-165 (TSC), ECF No. 1. However, in a Facebook post which included a photograph of an older female, she wrote, "This is Our Warrior Linda. We stayed with her and her daughter Stacey all day. They are somewhat locals. When we Marched to Capitol she said 'I'm going in' and she lead (sic) the way." Id. at 4. "Stacey" has since been identified as Stacey Lynn Stephens, 23-CR-134 (TSC) and "Linda" has been identified as her now deceased mother, Linda Carpenter. Thus, through social media analysis and cross-reference to a related investigation, the time and location of Bissey's entry can be further refined.

that he naturally observed. This Court sentenced Lattanzi to 14 days' incarceration. 22-cr-028 (TSC)

As noted above in footnote 2, Jamie Lynn Ferguson entered the Capitol together with Martinez and accompanied him to the Rotunda and was inside the Capitol Building for over 50 minutes. Her conduct was somewhat worse than Martinez's insofar as she made statements on social media prior to January 6 revealing that she anticipated some level of violence. However, she demonstrated a greater level of contrition than Martinez, in that during a pre-arrest interview, she gave investigators access to photos on her phone and did not attempt to minimize her conduct or the conduct of others. It was also clear from Exhibit 1, that Martinez led his small group's incursion into the Capitol while Ferguson followed. Judge Mehta sentenced Ferguson to a two-year term of probation. 22-cr-00194 (APM).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In this case, the government submits that a sentence of 14 days' incarceration and 36 months' probation, would not create an "unwarranted disparity" with the sentences imposed in those cases because of the similar factors in this case.[7]

---

[7] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); see, e.g., United States v. Little, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); see generally Appellee's Brief for the United States, United States v. Little, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. But see United States v. Panayiotou, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. See, e.g., United States v. Mize, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). See United States v. Anderson, 787 F. Supp. 537, 539 (D. Md. 1992); Panayiotou, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization

## V.       Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Martinez to 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

                              Respectfully submitted,

                              MATTHEW M. GRAVES
                              United States Attorney
                              D.C. Bar No. 481052

By:    s/ *Douglas Meisel*
         DOUGLAS MEISEL
         NY Bar No. 4581393
         Trial Attorney (Detailee)
         U.S. Attorney's Office
         601 D. Street, N.W.
         Washington, D.C.  20530
         douglas.meisel@usdoj.gov
         (202) 923-7821

---

first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

**CERTIFICATE OF SERVICE**

On this 27th day of June 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

                                          /s/ *Douglas Meisel*
                                          DOUGLAS MEISEL
                                          Trial Attorney (Detailee)
                                          U.S. Attorney's Office
                                          601 D. Street, N.W.
                                          Washington, D.C.  20530